## In re Kenhorst Borough. No. 1

*Darlington Hoopes*, for petitioners.

*C. W. Matten, John W. Speicher* and *William E. Fisher*, for remonstrants.

SHANAMAN, J., April 14, 1931.—On June 12, 1930, a petition was presented, signed by some 561 resident freeholders, setting forth that the villages and real estate developments known as Ridge Park, Ridge Park Addition, Fairview Hills, South Fairview, Rothfields and adjacent territory situate in Cumru Township, Berks County, Pa., contain a collection of houses collocated after a regular plan in regard to streets, alleys and lanes; that the said district contains not more than 800 freeholders, and that the petitioners desire to have the said villages and real estate developments incorporated under the style and title of "The Borough of Kenhorst," according to the plan or draft appended to the said petition, and as described by metes and bounds therein.

Said petition was directed to be filed with the clerk of court, whereupon advertisement was duly made that a hearing would be had on said application

on September 12, 1930. In accordance with the practice of this court in matters of this kind, a hearing was had and testimony heard on September 12, 1930, and at a continuance of said hearing, held on September 29, 1930, additional testimony was taken. Remonstrances against the proposed incorporation were filed by the Board of Supervisors of Cumru Township, by fifty-eight individual signers alleged to be "residents and freeholders of Cumru Township," and by the Directors of the Poor of the Berks County Poor District.

The judges have all viewed the proposed borough. We shall consider the exceptions set forth in the various remonstrances, taking up first those which object to any incorporation at all, and, secondly, those which merely remonstrate against the inclusion of specified portions of the proposed borough.

The number of families in the proposed borough is about 600, and comprises one-fourth of all the resident taxables of the township. From the testimony and admissions, it appears that there are 2735 taxables in the entire township, about 1200 of whom reside within the proposed borough, which would have a total population of about 2000. It appears, further, that the entire township contains a road mileage of fifty-two miles, of which about one and a-half miles is within the proposed borough; that the total township assessment, excluding exemptions, is $3,057,680, of which $1,005,335 would lie within the proposed borough. It is objected, therefore, first of all, that the incorporation would obviously deprive the township of one-third of its road taxes, while relieving it of the care of only one thirty-fifth of its roads, and would thereby impose considerable hardship on the remainder of the township outside the proposed borough. This fact, naturally of great concern to the remainder of the township, is not, however, of itself a reason to refuse the application, if the applicants ought to be incorporated. The major portion of the proposed borough is, quite manifestly to one viewing it, a built-up and continuous collocation of homes abutting, to a very considerable extent, on wretched streets. Into the history of this condition and the causes of it, we do not enter, nor do we express an opinion thereon. The present situation, however, as observed physically on the ground, is at least very suggestive that such a community needs, and is entitled, to govern itself. The purpose of the petitioners is to secure an efficient local self-government suitable to the essential municipality which has grown up within the section.

It is objected that the township has spent considerable sums and has indebted itself for moneys expended within the proposed borough. This objection was not pressed, and it has not been shown, nor has any attempt been made to show, that any extraordinary difficulty in the incorporation exists as a result of such expenditures.

It is objected that the territory in question is within a radius of ten squares of three fire companies, and that fire hydrants can be obtained by petitioning the township supervisors and assuming the cost thereof. This may be so. But a community as thickly and closely populated as this one is more likely to obtain its requirements if it governs itself.

It is objected that the proposed borough is between the City of Reading and the Borough of Shillington, and would prevent further expansion of these municipalities. We are not impressed by this objection.

It is objected, although not specifically excepted, that the borough will have insufficient income to perform its duties. The laws of Pennsylvania limit both the taxing and the borrowing power of the proposed borough. It will have to cut its coat according to its cloth, and will assuredly not be able to do everything at once, or even soon. But possessing a population of 2000, embracing 1200 adults residing in 594 homes, and comprising real estate of an assessed

valuation of $1,005,335, the people of the proposed borough should be able, by careful management, to improve to a marked degree their present municipal condition if granted home rule.

The remaining exceptions ask for the specific exclusion of certain portions of the proposed borough, to wit, explicitly: Ridge Park, Ridge Park Addition and the county farm lands, and perhaps, by implication, South Fairview. It is contended that these portions, or parts thereof (excepting county farm), have been improved either by grading, laying of water and gas mains, or otherwise, to such an extent that if included within the proposed borough, their owners would not benefit equally with owners of less improved sites, from the expenditure by the borough authorities of the proceeds of general taxation. It is admitted, however, that this argument, if it possess merit, applies with greater force to Ridge Park Addition than to South Fairview and Ridge Park. While all these developments have water mains, South Fairview has no street grades. In Ridge Park the grades have been established, but the streets have for the most part not been graded. There are some sidewalks. In Ridge Park Addition the streets have been graded, and the majority of the sidewalks, curbs and street gutters have been laid. Gas mains are also in the larger part of this section. However, the streets which have been improved in Ridge Park Addition have not been permanently paved; they have not been macadamized, but have been put down in cinder or gravel, and from time to time scraped.

The petitions and remonstrances, together with the testimony, disclose that in Ridge Park Addition there are seventy-seven houses. Seventy-four free-holders have petitioned, who, however, in the majority of cases, represent husband and wife. The testimony, while not perfectly clear, indicates that, counting tenants by entireties as one, there are fifty-seven freeholders in the section, of whom thirty-nine have petitioned. In Fairview Hills, the testimony and record show that there are 154 houses and 197 freeholders, of whom 159 have petitioned. In South Fairview, it appears that there are 422 freeholders, of whom 294 have petitioned. In Ridge Park, it appears that there are forty-four houses and seventy-one freeholders, of whom thirty-nine have petitioned. Besides the Board of Supervisors of Cumru Township and the Directors of the Poor of the Berks County Poor District, some fifty-eight individuals signed remonstrances, wherein they are alleged to be "residents and freeholders of Cumru Township." Of these, one is the Berks County Real Estate Company, which owns from 60 to 65 per cent. of the buildable area of Ridge Park and Ridge Park Addition. The greater part of its holdings is unimproved ground, and its holdings do not represent 60 per cent. of the assessed valuation of the development of which they form a part.

It is apparent, therefore, that a majority of the freeholders of the various sections, as well as of the total area of the proposed territory to be incorporated, have petitioned for its incorporation. Counsel do not contend otherwise, and, as far as numerical requirements of signers are concerned, the number of petitioners and the proportion which this number bears to the total number of resident freeholders within the territory are sufficient to meet the statutory requirements. The degree of improvement existing in some parts of the proposed borough is doubtless higher than in some others, but this is a frequent condition, and neither on precedent nor on reason does it stand in the way of a needed incorporation. The laws for the improving of borough thoroughfares are comprehensive and elastic, and afford a ready means of doing the work in proper stages, and in a way fair and convenient to the abutters and to the public.

It is next contended that the territory laid out is in excess of any possible requirements of the borough. The testimony is that 515 acres are involved, containing 594 houses, with a population of 2000. Engineer Mast testified that one-sixth to one-seventh of the proposed area is farm land. J. Norman Klein, a developer in the vicinity and an officer of a remonstrant development corporation, testified that one-third of the area was used exclusively for farming purposes. The area of unbuilt lots is, in our opinion, rather large, if not excessive. In so stating, we do not forget that a borough, no less than a city, may properly contain a reasonable quantity of unbuilt ground to allow for parks, playgrounds, factory sites and the housing of a growing population.

It is further objected that a considerable portion of the proposed borough is now exclusively used for the purpose of farming. The General Borough Act of May 4, 1927, P. L. 519, section 206, provides that "the court may, if it deem such land does not properly belong to the borough, at the request of the party aggrieved, change the boundaries so as to exclude therefrom the land used for farming purposes." The Roth farm, appearing on the plan without streets, is in the southwest section of the proposed borough. It is used exclusively for farming purposes, but its owner has laid it out on a plan of lots, which he has had recorded and approved by the City Planning Commission. He has not remonstrated against the inclusion of his property, which we understand to be known as "Rothfields," in the borough. Of course, the fact of his not protesting does not conclude us from considering the desirability or undesirability of including his farm. A portion of the county farm, appearing on the map without streets, lies at the northwest corner of the borough and is used exclusively for farm purposes by the directors of the poor. The directors of the poor have remonstrated against its inclusion. There is, in addition, a portion marked on the plan in streets, and lying to the south of Ridge Park, which witness Klein testified is used exclusively for farming. It does not appear that the owners thereof have remonstrated, nor is the precise area or compass of this section clearly described in the testimony. However, witness Klein testified that the total area of the farming portion is one-third of the total area of the borough. Engineer Mast estimated it at one-sixth to one-seventh. The portion of Ridge Park lying between the above described farms is undeveloped and contains about a dozen houses.

It is fair to say that the portion of the proposed borough owned by the county, and now known as the "Poor Farm," and that portion which lies to the south of the said poor farm and west of Hancock Boulevard, and extends to Philadelphia Avenue, are not urban, but are for the most part rural, both at present and in immediate prospect. Such portion constitutes about one-third of the proposed borough, and is undeveloped and used largely as farm land. In our opinion, its inclusion at this time would be of no present or near benefit to its occupants, and might well prove instant financial detriment, not only to them, but to the rest of the proposed borough, as well as to the remainder of the township. As development takes place, it will be possible in the future for the owners of this section to petition for incorporation either to the new Borough of Kenhorst or to the existing Borough of Shillington. This could be done either under section 410 or section 425 of article IV of the General Borough Act of May 4, 1927, P. L. 519. We are of opinion, also, that the remainder of the proposed borough contains sufficient undeveloped ground for all probable municipal requirements.

We, therefore, are of opinion that the proposed borough should be incorporated in accordance with the petition, except that the western boundary should run from the easternmost junction of the poor farm with Lancaster Avenue,

at a point between Summit Avenue and Funston Avenue, thence in an easterly direction along the line of the county farm to the northeast corner of that farm, thence in a southerly direction along the eastern line of the same farm to the southeastern corner of the county poor farm, where said corner abuts on Hancock Boulevard and Harding Boulevard, thence in a southerly and subsequent southwesterly direction along Hancock Boulevard to Philadelphia Avenue. The engineer can assist counsel in revising and fixing the line so as to accord substantially with the indications of this opinion. ". . . We have no power to amend the petition by changing the lines as set forth in it, but must either incorporate or refuse to incorporate it as prayed for. If we were of the opinion that we have the right to depart from the line set out in the petition, we would have no hesitation in incorporating within these new lines:" In re Incorporation of Mocanaqua Borough, 20 Luzerne Leg. Reg. 138, 140. Incorporation of Borough of Munhall, 25 Pa. C. C. 287, accord.

And now, to wit, April 14, 1931, the prayer of the petition for the incorporation within limits described in the petition is refused, and leave is granted to present a petition changing the lines of the proposed borough to meet the suggestions contains in the opinion this day filed.

From Charles K. Derr, Reading, Pa.